# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 03-1441/1544

_____

| | |
|---|---|
| Craftsmen Limousine, Inc., | * |
| and JMRL Sales & Service, Inc., | * |
| doing business as Craftsmen | *   Appeal from the United States |
| Limousine, | *   District Court for the Western |
| | *   District of Missouri. |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Ford Motor Company and American | * |
| Custom Coachworks, | * |
| | * |
| Appellants. | * |
| | * |
| _____ | * |
| | * |
| Nos. 03-1444/1546 | * |
| _____ | * |
| | * |
| Craftsmen Limousine, Inc., | * |
| a Missouri corporation, JMRL | * |
| Sales & Service, doing business as | * |
| Craftsmen Limousine, Inc., | * |
| a Missouri corporation, | * |
| | * |
| Appellees; | * |
| | * |
| v. | * |
| | * |
| Ford Motor Company, a Delaware | * |

corporation; General Motors      \*  
Corporation, a Missouri corporation;   \*  
Cadillac, a division or affiliate of   \*  
General Motors Corporation; Limo,   \*  
an association of limousine builders;   \*  
AHA Automobile Design,   \*  
a Canadian corporation,   \*  
  \*  
     Appellants.   \*  

_____

Submitted: September 10, 2003

Filed:  April 13, 2004
_____

Before MELLOY, LAY, and SMITH, Circuit Judges.

_____

MELLOY, Circuit Judge.

Limousine manufacturers, Craftsmen Limousine, Inc. and JRML Sales & Service, Inc., collectively referred to as "Craftsmen," sued American Custom Coach ("American Coach"), several other limousine manufacturers, and Ford Motor Company ("Ford") for antitrust violations under the Sherman Act, 15 U.S.C. § 1.[1] Craftsmen alleged that defendants conspired to prevent it from advertising in the limousine industry's two trade publications and from attending trade shows. At trial, the jury rendered a verdict in favor of Craftsmen in the amount of $2,109,707.00. Craftsmen then filed a motion to treble the verdict and for attorney fees and costs.

---

[1] Craftsmen voluntarily dismissed or settled with all defendants but Ford and American Coach.

-2-

After denying defendants' post-trial motions, the district court granted Craftsmen's motion for fees and trebled Craftsmen's damage award to $5,941,621.00. Defendants now appeal. We affirm in part and reverse in part.

I.    BACKGROUND

A. Craftsmen, Ford, American Coach, & the National Highway Traffic Safety Administration

Craftsmen is a closely held corporation owned by Robert Haswell and Marc Haswell. Since it began in the late 1980's, Craftsmen has converted many automobiles, including Ford's Lincoln Town Cars, into limousines. Like other coachbuilders, Craftsmen creates limousines by cutting a base vehicle in half and adding structural pieces of varying lengths in the middle. Craftsmen sells from an inventory of pre-built units and also offers conversion services on vehicles already owned by the end-users. American Coach, one of the largest manufacturers of limousines in the United States, is one of Craftsmen's direct competitors.

Ford does not make limousines. Instead, it manufactures base vehicles that are later converted into limousines by independent coachbuilders like American Coach and Craftsmen. During the relevant time period in this case, approximately sixty per-cent of the six thousand limousines produced each year were converted from Ford's Lincoln Town Cars.

The limousine industry is regulated by the National Highway Traffic Safety Administration. The National Highway Traffic Safety Administration promulgates Federal Motor Vehicle Safety Standards with which limousine manufacturers must comply. Coachbuilders are responsible for self-certifying that their vehicles meet the federal safety standards. This self-certification can be in the form of engineering analysis, computer analysis, or other valid documentation. If the National Highway

Traffic Safety Administration determines that a coachbuilder's limousine fails to comply with federal standards, it has the authority to fine the coachbuilder and recall the limousine.

In 1992, upon the National Highway Traffic Safety Administration's request, Craftsmen submitted data identifying its limousine conversion techniques. Craftsmen did not provide engineering analyses to demonstrate compliance with all Federal Motor Vehicle Safety Standards requirements. Instead, it claimed its vehicles were safe based on the construction techniques employed and the fact that none of its customers ever returned a limousine out of a concern for safety.[2] At the time, no engineers worked for Craftsmen, and the company had not contracted an independent engineer to test the safety of its vehicles.

After receiving Craftsmen's data, the National Highway Traffic Safety Administration conducted an inspection of Craftsmen's limousines. The investigation resulted in the recall of some of Craftsmen's vehicles. One recall required Craftsmen to put a placard in its limousines instructing passengers that they had to "unlock door and pull door latch" to exit the vehicle. Another required Craftsmen to replace tires on approximately twenty of its limousines. Craftsmen complied with the recall orders and was not fined by the National Highway Traffic Safety Administration.

B. The Formation of Ford's QVM Program

On April 3, 1987, a wedding party in New York was killed when its limousine was hit and split in half as it crossed an intersection. National media coverage of this accident, coupled with other reports of limousine fires and tire blowouts, prompted

_____

[2] Craftsmen also relied upon testing Ford had conducted on its base vehicles to verify the safety of components that were not altered during the conversion process, such as door locks.

the National Highway Traffic Safety Administration to conduct an investigation of the limousine industry. The National Highway Traffic Safety Administration found that there were approximately fifty to sixty coachbuilders nationwide. A few large coachbuilders converted up to one thousand vehicles per year, but many coachbuilders converted one hundred vehicles or less. Some coachbuilders had engineering backgrounds, others did not; some worked out of dirt floor garages, and others out of modern facilities. At trial, Robert Hellmuth, former director of the National Highway Traffic Safety Administration's Office of Vehicle Safety Performance, testified that there was little uniformity in the conversion techniques being used at the time. Most coachbuilders either disregarded the Federal Motor Vehicle Safety Standards or were unaware they existed.

After the National Highway Traffic Safety Administration's investigation, Robert Hellmuth urged Ford, General Motors, and the members of the limousine industry to pool their resources to develop testing to make sure that limousines were in compliance with federal safety standards. At trial, Robert Hellmuth recalled his discussion with Ford and General Motors as follows:

> I said, you know, [the coachbuilders] are buying your product, and it would certainly be a wonderful idea for you to help them out, because they certainly don't have the facilities you do, they don't have the technical information you do, and if, if they can't rely on you, you know, they're really not going to be able to build a safe vehicle. (Tr. 1536-37.)

Thereafter, Ford assembled a team of forty-five to fifty engineers to ensure that the 418-Town Car chassis met all federal safety requirements when stretched within certain defined limits. After spending over one year and millions of dollars designing and testing the new 418-Town Car chassis, Ford initially limited 418-conversions to end-products that weighed 7,100 pounds or less and were not longer than 85 inches. Later, Ford determined that 418-Town Cars could be safely stretched to 120 inches.

After conducting this research, Ford formed a vehicle certification program called "Quality Vehicle Modifier" ("QVM"). Through its QVM program, Ford distributed information explaining how to convert Ford 418-Town Cars into limousines that met Federal Motor Vehicle Safety Standards. The manufacturing guidelines, which were available to non-QVM participants and QVM participants alike, set forth conversion techniques, quality control procedures, and continuous improvement practices. As an incentive for complying with its guidelines, Ford paid QVM participants $2,000 to $3,000 for each 418-Town Car properly converted. If a QVM participant stretched a 418-Town Car outside the limits Ford specified, or stretched any other Ford product, the coachbuilder would no longer be eligible for the QVM program incentives unless it provided test data establishing Federal Motor Vehicle Safety Standards compliance.[3] Ford engineer, Roy Radokovich, testified that by helping coachbuilders build safer products that met all Federal Motor Vehicle Safety Standards, Ford hoped to reduce the potential liability it faced from having its name associated with untested limousines. Radokovich further testified that Ford hoped the QVM program would improve its product image and help Ford compete with General Motors in the luxury car market.

Within two years after Ford's introduction of the QVM program, General Motors introduced a similar safety program, the Cadillac Master Coachbuilders program ("CMC"). The vast majority of coachbuilders in the industry participated in the QVM or CMC program or both.

Shortly after unveiling QVM, Roy Radokovich visited Craftsmen's facilities and asked Robert Haswell to enroll Craftsmen in the program. Haswell testified that he declined for the following reasons: (1) Craftsmen had little to gain from joining,

---

[3]To assist those coachbuilders wanting to safely go beyond the QVM guidelines, Ford provided the names of engineering firms that did testing or analysis. T1461.

as it was already employing the conversion techniques described in the QVM manual; (2) Craftsmen had already safely built and sold a number of limousines that exceeded the QVM's length restrictions, and if it were to stop building these longer limousines, Craftsmen would dissolve;[4] and (3) Craftsmen did not want to purchase insurance naming Ford as an insured, which was a requirement of the QVM program. At trial, Radokovich admitted that he was impressed with Craftsmen's building process. He testified that Craftsmen had all the QVM information Ford had disseminated, and that Craftsmen had built conversion parts in accordance with the QVM guidelines. A National Highway Traffic Safety Administration safety compliance engineer who inspected Craftsmen's limousines in the early 1990's agreed that Craftsmen appeared to be following QVM practices.[5]

At trial, Craftsmen argued that although QVM disguised itself as an overseer of safety, it was actually formed to increase Ford's profits from its control of the limousine manufacturing market. Marc Haswell testified that Ford's safety goals were belied by the fact that some QVM builders reduced the gauge of the metal they used and omitted structural pieces that ensured the structural integrity of their limousines. Marsha Tortora, one of the first participants in QVM, testified that from 1990 to 1997 Ford did nothing to determine whether her limousines were safe. Craftsmen claimed that during that time period, Ford never tested the safety of any of the vehicles produced by QVM manufacturers.

---

[4] The record indicates that more than ninety percent of Craftsmen's conversions were over 120 inches.

[5] The National Highway Traffic Safety Administration safety compliance engineer who inspected the brake systems on Craftsmen's vehicles concluded: "[I]t appears Craftsmen exercised caution during vehicle production by following Ford's QVM guidelines for limousine manufacturers and sound manufacturing processes for all other vehicles. Therefore, Craftsmen's limousines may meet the performance requirements of [the federal safety standard pertaining to hydraulic brakes], but there is no test data to form definite conclusions." (App. at 2320.)

Robert Hellmuth, former director of the National Highway Traffic Safety Administration's office of Vehicle Safety Performance, gave a different account of the efficacy of the QVM program. He stated:

> The people that got into the QVM program really started building nice vehicles because they had something they could hang their hat on . . . . They had all the Ford test data[.] Ford did all the crash work for them, did all the documentation, they did everything. Basically if you were in the QVM program and you built it like they told you to build the thing, it would be fully certifiable, it would meet the [federal] standards, it would be a safe vehicle. (Tr. 1547-48.)

Hellmuth further testified that Ford's QVM handbook was "[b]asically a cookbook recipe on how to build a limousine to meet all the federal safety standards." (Tr. 1547.)

C.    The Formation of LIMO

Around the same time Ford created QVM, the National Highway Traffic Safety Administration, Ford, and General Motors suggested the formation of the Limousine Industry Manufacturers' Organization ("LIMO"). The National Highway Traffic Safety Administration hoped that LIMO would provide its members with technical information, keep them apprised of upcoming legislation, and enable them to pool their resources for additional safety testing. The record suggests that LIMO did not accomplish all of these objectives. In 1990, the National Highway Traffic Safety Administration commended LIMO's effort to organize safety testing but criticized its failure to provide significant test data.[6]

---

[6]The only test reports LIMO submitted to the National Highway Traffic Safety Administration were in regard to the safety of limousine hydraulic brake systems.

Although Ford was not a limousine manufacturer, it became a non-voting member of LIMO. American Coach was a voting member. Craftsmen contends that defendants lobbied to exclude it from LIMO. Former LIMO President, Marsha Tortora, testified that during LIMO meetings, Ford's representative would "talk about the importance of QVM, [and] that they had to keep non-compliant people out." (Tr. 323.) Tortora testified that American Coach's representative was equally adamant against allowing non-QVM coachbuilders to join LIMO. According to Tortora, he feared it would take the spotlight away from American Coach's product and would "make Ford unhappy." (Tr. 295.)

Although Tortora believed that LIMO's doors should be opened to QVM and non-QVM coachbuilders alike, LIMO's bylaws initially limited membership to QVM coachbuilders. However, the bylaws were amended in 1995 to allow non-QVM coachbuilders to join LIMO upon submitting valid crash-test results. Because Craftsmen was not a member of QVM and did not perform crash-tests on its vehicles, it was not eligible to join LIMO.

D. Alleged Group Boycott

To reach its target market, Craftsmen advertised in limousine magazines and displayed its vehicles at the magazines' trade shows. Craftsmen advertised in *Limousine & Chauffeured Magazine* from 1989 to 1991, when the two had a disagreement over a billing dispute. Thereafter, it began advertising in *Limousine Digest*. Until 1997, *Limousine Digest* and *Limousine & Chauffeured Magazine* were the only trade publications in the limousine industry.[7]

---

[7] In 1997, two new magazines entered the limousine publications market, *Dealer's National Limousine Exchange* and *International Limousine and Livery Trader*. At trial, Haswell testified that these two publications were not comparable to *Limousine Digest* or *Limousine & Chauffeured Magazine*, as neither provided national exposure.

In 1993, *Limousine & Chauffeured Magazine* enacted a policy limiting all limousine advertisements and participation in its trade shows to products that met QVM or CMC standards. Thereafter, *Limousine Digest* also stopped allowing Craftsmen to advertise vehicles that exceeded QVM restrictions, and it rescinded Craftsmen's invitation to attend its 1995 trade show. In May 1996, *Limousine Digest* formally enacted a restrictive advertising policy similar to the one *Limousine & Chauffeured Magazine* had previously adopted.[8] However, *Limousine Digest's* policy was not a blanket-ban on all non-QVM products; it allowed non-QVM coachbuilders to advertise upon submitting independent proof of Federal Motor Vehicle Safety Standards compliance.

At trial, Craftsmen introduced evidence that the magazines' restrictive advertising policies were the result of threats leveled by Ford, American Coach, and other members of LIMO. Marsha Tortora testified that *Limousine & Chauffeured Magazine's* publisher, Sara McLean, told her that the magazine's policy was a result of direct pressure she had received from Ford and the QVM coachbuilders who were voicing their concerns through LIMO. (Tr. 310-12.) Similarly, Robert Haswell testified that *Limousine Digest's* publisher, Ric Cohen, told him that he "was getting pressure to change [Craftsmen's] ad so that [Craftsmen] did not show anything that [QVM coachbuilders] couldn't build." (Tr. 936.) Haswell further testified that when he asked Cohen why he had removed a particular Craftsmen advertisement from *Limousine Digest*, Cohen replied that he had received "all kinds of heat," and that "in order to have a show, [he] had to agree to remove [Craftsmen] and the other non-QVM builders from the magazine as well as the show." (Tr. 958.)

_____

[8] Although Craftsmen was allowed to attend *Limousine Digest's* 1996 trade show, which took place before *Limousine Digest* adopted its formal ban, Craftsmen received unfavorable treatment: it was relegated to an obscure location behind a curtain; it was required to remove its display car from the showroom after only one night of the three-night show; and it was not allowed to distribute brochures.

Craftsmen also introduced written evidence showing that *Limousine Digest* was pressured into adopting its advertising restrictions. Minutes of an April 30, 1996 LIMO meeting established that LIMO members unanimously agreed not to endorse or participate in any publication or trade show that promoted non-QVM/CMC coachbuilders. (App. at 2091-92.) Thereafter, LIMO President, Cabot Smith, wrote *Limousine Digest's* publisher, Ric Cohen, a letter informing him of LIMO's policy. (App. at 2093-94.) Upon receiving Smith's letter, Ric Cohen, replied with the following confirmation:

> Effective immediately, we have decided to respond favorably to all of your requests by removing all Non-Compliant advertisements from *Limousine Digest*, as of the very next issue to go to press (July '96). We will also maintain our policy of only allowing QVM and CMC certified limousine manufacturers to exhibit their vehicles at the '96 Limo Digest Show.[9] We are making those concessions contingent upon your agreement to provide the full and exclusive endorsement of LIMO and all of its members for the '96 Limo Digest Show.
>
> Please understand the severe financial implications that this will have upon my company and kindly convey your understanding to any members of our industry that can help to support the changes we are making. I would greatly appreciate LIMO's assistance in attracting additional and more regular

---

[9] At trial, Ric Cohen testified that *Limousine Digest's* policy allowed non-QVM/CMC coachbuilders to advertise if they presented independent proof of Federal Motor Vehicle Safety Standards compliance. (Tr. 1285.) Ultra Limousine, a non-QVM coachbuilder, provided *Limousine Digest* with independent crash-testing data and subsequently advertised a non-QVM limousine in the publication. Ultra agreed to share its crash-testing data with Craftsmen in exchange for $35,000, half the crash-testing cost. Robert Haswell testified that he declined Ultra's offer, because crash-testing was not required for Craftsmen to meet National Highway Traffic Safety Administration standards. The record contains a memorandum written by a National Highway Traffic Safety Administration safety compliance engineer indicating that the National Highway Traffic Safety Administration did not require Craftsmen to crash-test its limousines due to their weight. (App. at 2317).

support from Lincoln and Cadillac to further assist us in this development. (App. at 2095.)

Two days after receiving Cohen's letter, Cabot Smith sent the following fax to his fellow LIMO members:

Congratulations!

Attached you will find a commitment in writing from Ric Cohen of *Limousine Digest* to remove all non-QVM and non-CMC advertisers from his magazine and from displaying at this show.

The message LIMO sent was loud and clear because it was supported in writing by the individual member companies.

This unified voice and member support is what LIMO needs to accomplish its objectives. (App. at 2085.)

Craftsmen also presented evidence that LIMO members continued to apply pressure to *Limousine Digest* even after the publication adopted its 1996 restrictions. Coachbuilder Bill Alden testified that he listened to a telephone conference call between Cohen and a number of LIMO members in 1997 or 1998, during which the coachbuilders threatened to quit advertising in *Limousine Digest* if it allowed non-QVM coachbuilders to attend its trade show. To the best of Alden's knowledge, no one from Ford participated in the conference call.

E.   Was Ford Driving LIMO?

Ford argues that to the extent LIMO may have influenced *Limousine & Chauffeured Magazine* or *Limousine Digest* to exclude non-QVM coachbuilders, Ford played no role in LIMO's actions. Ford relies on the testimony of Marsha Tortora to support its position. Tortora admitted that the main focus of every LIMO

-12-

meeting was on how to keep non-QVM coachbuilders from advertising and attending trade shows, but she said that most of those discussions were held in executive sessions that Ford, as a non-voting member, was not allowed to attend. Tortora acknowledged that some of the discussions took place in open session, but stated that "Ford was very hands off in those conversations most of the time."[10] According to Tortora, "[i]n open discussion, . . . Ford didn't tell [coachbuilders] not to participate in the shows, they said they won't participate in the shows that had non-QVM's in it." (Tr. 372.)

Craftsmen maintains that Ford was well aware of LIMO's goals, inasmuch as it attended LIMO meetings, heard its discussions about boycotting non-QVM dealers, and lobbied to keep non-QVM members from joining LIMO. Craftsmen notes that although Tortora testified that Ford was ordinarily "very hands off" during the open session discussions about advertising, she also testified that it was "no secret" that Ford did not want QVM members to advertise in magazines that promoted non-QVM products. (Tr. 375-76). In fact, she stated that "[Ford] told [her] outright and in writing that [she] couldn't participate or sell or have any business with anybody who was non-QVM." (Tr. 376.)

F. Damages

Craftsmen claimed that it lost conversion fees, ranging from $25,000 to $35,000 per vehicle, from January 1995 through June 1998.[11] It presented evidence

---

[10] During cross-examination, Tortora testified that when Vinnie Bergman, a non-QVM coachbuilder, tried to join LIMO, Ford spoke out loudly against it. Despite Ford's protest, LIMO extended membership to Bergman. Defendants claim that they did not want Bergman in LIMO, because he had a reputation for dishonesty and engaged in questionable business practices.

[11] The record suggests that by 1998, Craftsmen began converting sport utility vehicles and buses to mitigate its damages. One of the sport utility vehicles

that its sales decreased from approximately 50 vehicles in 1995 to approximately 37 vehicles in 1997. Craftsmen alleged that this decline was a result of defendants' alleged boycott. In support of Craftsmen's contention, Robert Haswell testified that some of Craftsmen's customers called just to see if it was still in business when Craftsmen was not advertising in the trade magazines. However, Marc Haswell admitted that between 1995 and 1999 Craftsmen's website received approximately 90,000 hits.

Defendants denied that any of their actions caused the decrease in Craftsmen's conversions. They claimed that other factors, including increased competition, affected Craftsmen's growth rate. At trial, Robert Haswell conceded that two new non-QVM coachbuilders, Legendary Coachworks and S&R Coachworks, entered the market in 1995. S&R Coachworks was founded by a person who previously had been responsible for cutting, welding and stretching Craftsmen limousines. Like Craftsmen, Legendary Coachworks and S&R Coachworks both built non-QVM limousines in excess of one-hundred twenty inches.

Before trial, the district court held a hearing to determine whether plaintiffs' expert witness, David Cole, passed muster under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Cole is a certified public accountant. In addition to taking post-graduate courses covering all areas of financial management, including economics, marketing, and finance, Cole has also served as the executive vice president for a national accounting firm and has worked with privately held businesses to establish property values for buy-sell agreements and values for estate tax purposes. Although Cole had no experience in the field of antitrust litigation, he

---

Craftsmen converted was Ford's Lincoln Navigator. *Limousine & Chauffeured Magazine* allowed Craftsmen to advertise the stretched Navigators until Ford barred QVM dealers from converting Navigators.

-14-

reviewed scholarly literature to support his method of calculating damages in this case.

Cole used a "but for" method to determine Craftsmen's damages. Using Craftsmen's financial statements and tax returns, he calculated an average growth rate of sixty-two percent for the time period beginning in 1991 and ending in 1994. Cole testified that this figure was reasonable in light of conversations he had with Robert Haswell and his review of an outside study that supported his figure. Cole then testified that he calculated what Craftsmen's sales would have been with the projected growth rate and compared those figures to Craftsmen's actual sales. After offsetting the difference between these two figures by Craftsmen's projected operating expenses during the damage period,[12] Cole concluded that Craftsmen sustained a net profit loss of $2,109,770.00. In reaching this figure, Cole did not analyze whether general economic conditions or increased competition affected Craftsmen's growth rate. Instead, he assumed that defendants caused all of Craftsmen's injuries. The district court found that Cole's testimony was sufficiently relevant and reliable to go to the jury.

## II. APPLICABLE LAW AND DISCUSSION

A. Whether the Evidence Was Sufficient to Establish an Antitrust Conspiracy

---

[12] Cole used the term "cost of sales" to reflect Craftsmen's operating expenses. He testified that he needed a calculation to derive an average growth profit percentage "so that sales that we didn't realize in the future wouldn't have been all profit. They would have been a percentage, because there's obviously a cost associated with those sales. So, we had to come up with the average growth profit percentage in order to apply it to the sales that were lost in order to get a lost profit number." Ap. 1773-74 Cole testified that he calculated a figure of 83.75% as the "average cost of sales as compared to gross sales for the period '95 through '98." Id.

Defendants argue that the jury's verdict must be reversed, because the evidence was insufficient to establish a conspiracy between Ford and American Coach. In determining whether the evidence is sufficient to support a jury's verdict, we view the evidence in a light most favorable to the appellee. Pumps & Power Co. v. Southern States Indus., Inc., 787 F.2d 1252, 1258 (8th Cir. 1986). We must assume as proven all facts that the appellee's evidence tended to show, give it the benefit of all reasonable inferences, and assume that all conflicts in evidence were resolved in its favor. Id. at 1258.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Because defendants typically cannot be relied on to confess that they have entered into an unlawful agreement, conspiracy cases usually must be proved by circumstantial evidence. ES Development, Inc. v. RWM Enterprises, Inc., 939 F.2d 547, 553 (8th Cir. 1991) ("[I]t is axiomatic that the typical conspiracy is rarely evidenced by explicit agreements, but must almost always be proved by inferences that may be drawn from the behavior of the alleged conspirators.") (internal quotations omitted). "Thus, an antitrust plaintiff may prove the existence of a combination or conspiracy by providing either direct or circumstantial evidence sufficient to warrant a . . . finding that the conspirators had a unity of purpose or common design and understanding, or a meeting of the minds in an unlawful arrangement." Id. at 554 (internal quotations omitted).

Although it may be in the form of circumstantial evidence, a plaintiff must present some evidence that tends "'to exclude the possibility that the alleged coconspirators acted independently.'" St. Louis Convention & Visitors Comm'n. v. N.F.L., 154 F.3d 851, 861 (8th Cir. 1998) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 (1986)). "Conduct that is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Lovett v. General Motors Corp., 998 F.2d 575,

578 (8th Cir. 1993) (citing Matsushita, 475 U.S. at 588). Furthermore, "In situations where a trade association, its officers, employees or members are found to have violated the antitrust laws, membership in the association will not automatically involve all members in the violation. There must, instead, be some evidence of actual knowledge of, and participation in, the illegal scheme in order to establish a violation of the antitrust laws by a particular association member." AD/SAT v. Associated Press, 181 F.3d 216, 234 (2nd Cir. 1999) (quoting Thomas Vakerics, Antitrust Basics, § 6.13).

Defendants argue that the record contains no evidence from which a reasonable jury could find that they conspired to exclude Craftsmen from advertising or attending trade shows. They note that LIMO's President testified that Ford "didn't tell us not to participate in shows, they said they won't." According to defendants, this evidence confirms that Ford acted independently. Ford argues that even if LIMO's policies evinced concerted action, Ford never voted on or participated in the making of those policies. Defendants' arguments are unpersuasive.

We agree with the district court that the April 30, 1996 LIMO meeting minutes, the May 7, 1996 letter from Ric Cohen to Cabot Smith, and the May 9, 1996 fax from Cabot Smith to his fellow LIMO members provided ample evidence from which a reasonable jury could find that defendants engaged in a conspiracy in violation of Section 1 of the Sherman Act. The clear import of these documents is that LIMO members collectively pressured *Limousine Digest* to exclude non-QVM coachbuilders, like Craftsmen, from advertising in their publications and attending their trade shows. From this evidence, a reasonable jury could infer that LIMO applied similar pressure to the industry's only other national publication at the time, *Limousine & Chauffeured Magazine*. Although Ford was not a voting member of

LIMO, there is sufficient evidence, including Marsha Tortora's testimony,[13] from which a reasonable jury could find that Ford influenced LIMO's agenda. Taken as a whole, the evidence introduced at trial was sufficient to create a jury question as to whether the defendants acted in concert or independently.

B. Whether the District Court Erred in Applying the *Per Se* Analysis.

We review the district court's determination that the alleged agreement between Ford and American Coach constituted a *per se* antitrust violation <u>de novo</u>. <u>In re Cardizem CD Antitrust Litigation</u>, 332 F.3d 896, 905-06 (6th Cir. 2003); <u>United States v. Brown</u>, 936 F.2d 1042, 1045 (9th Cir. 1991); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶1909b (1998) (although a court's determination that the *per se* rule applies "might involve many fact questions, the selection of a mode [of analysis] is entirely a question of law.").

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Despite its broad language, Section 1 has long been interpreted to outlaw only those restraints that are "unreasonable." <u>Arizona v. Maricopa County Med. Soc'y</u>, 457 U.S. 332, 343 (1982). The United States Supreme Court has set forth three methods for analyzing the reasonableness of a restraint on trade: rule of reason analysis, *per se* analysis, and quick look analysis.

The rule of reason is the "prevailing standard" for determining a restraint's effect upon competition in a relevant market. <u>Continental T.V., Inc. v. GTE Sylvania,</u>

_____

[13] Tortora testified that Ford sometimes took part in LIMO meeting discussions on how to keep non-QVM coachbuilders from advertising and attending trade shows, and that Ford expressly forbade her from dealing with non-QVM coachbuilders. (Tr. 376.)

Inc., 433 U.S. 36 , 49 (1977).  See also Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 726 (1988) ("there is a presumption in favor of a rule-of-reason standard"); State Oil Co. v. Kahn, 522 U.S. 3, 22 (1997) ("[T]he majority of commercial arrangements subject to the antitrust laws[] should be evaluated under the rule of reason").  Under this approach, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect."  State Oil Co., 522 U.S. at 10.

When a restraint's negative impact on competition is immediately discernable and the restraint has no redeeming virtue, the *per se* mode of analysis applies. Continental T.V., Inc., 433 U.S. at 50; State Oil Co., 522 U.S. at 10 ("Some types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*.").  Unlike the rule of reason analysis, *per se* analysis does not allow inquiry into the intent behind the restraint, its pro-competitive justifications, or its actual effect on competition.  Cardizem, 332 F.3d at 906-07 (citing National College Athletic Ass'n. v. Board of Regents, 468 U.S. 85, 100 (1984)).  Instead, the *per se* mode of analysis applies a "'conclusive presumption'" of illegality.  Id. (quoting Maricopa County, 457 U.S. at 344).  Because of the strength of this presumption, the *per se* analysis is appropriate only where "experience with a particular kind of restraint enables the court to predict with confidence that the rule of reason will condemn it."  Maricopa County, 457 U.S. at 344.  "Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets, group boycotts, and tying arrangements."  Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5 (1958) (internal citations omitted).

In cases where the repercussions of a suspicious restraint are unclear, courts may make a truncated inquiry into the restraint's output or price effects before

deciding which mode of analysis to apply. See FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 459 (1986) (applying quick look approach to a horizontal agreement among dentists to withhold from their customers a particular service); Chicago Prof'l Sports Ltd. P'ship. v. NBA, 961 F.2d 667, 676 (7th Cir. 1992) cert. denied, 506 U.S. 594 (1992) (finding that district court did not err in application of "quick look" analysis). This "quick look" approach is "reserved for circumstances in which the restraint is sufficiently threatening to place it presumptively in the *per se* class, but lack of judicial experience requires at least some consideration of proffered defenses or justifications." Areeda & Hovenkamp at ¶ 1911a. After taking a "quick look" at the defendant's proffered reasons for the restraint, a district court has three options:

> First, it may reject that evidence and condemn the restraint with little or no inquiry into power (as unlawful "*per se*"); second, it may find the evidence essentially unconvincing, but still have a few doubts about whether the restraint itself is appropriate for *per se* condemnation, thus making at least a quick look at market power appropriate; or third, it may find the evidence *plausible*, in which case the restraint is subjected to general rule of reason analysis requiring full consideration of power and anticompetitive effects. Areeda & Hovenkamp at ¶ 1911c (emphasis added).

At trial, the district court found that Ford had "transformed itself into a horizontal competitor" through its action and influence with the QVM manufacturers. (Tr. 1431.) Without further analysis, the district court held that the *per se* rule was applicable. On appeal, Ford argues that it is not a horizontal competitor of Craftsmen, because Ford does not manufacture limousines. Ford therefore contends that the alleged agreements between Ford and American Coach were vertical restraints subject to the rule of reason analysis. See Nynex Corp. v. Discon, Inc., 525 U.S. 128, 135 (1998) (holding that the *per se* rule does not apply to a vertical agreement between a buyer and supplier, and noting that "precedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors"); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212 (1959) (applying the *per se* rule to a boycott arranged by a single competitor of the plaintiff,

but carried out by a "wide combination" consisting of manufacturers and distributors, as well as the competing retailer). We need not determine whether Ford "transformed" itself into a horizontal competitor. Even assuming Ford and American Coach were direct competitors of Craftsmen, the *per se* rule should not have been applied in this case.[14]

Through its QVM program, Ford established voluntary safety standards for the manufacture of limousines. Although most coachbuilders joined the QVM program and agreed to build within QVM guidelines, some coachbuilders, like Craftsmen, chose not to join or abide by QVM restrictions. Craftsmen alleged that defendants effectively shut them out of the market by pressuring the limousine industry's trade publications to exclude non-QVM coachbuilder from advertising and attending trade shows. In essence, defendants' alleged restraint was an attempt to force Craftsmen to either comply with QVM guidelines or stop selling limousines. The question is whether Ford's insistence on QVM compliance was arguably rooted in safety concerns, and if so, whether this should remove the alleged agreement from the *per se* rule's realm. We believe it does.

As Areeda & Hovenkamp note, "Exclusion by the joint setting and enforcement of standards is ordinarily evaluated under the rule of reason." ¶ 2232b. This is so because the creation and enforcement of standards, including safety standards, often has pro-competitive effects. For example, having unsafe limousines in the market

---

[14] The dissent in footnote 3 glosses over a fundamental question that must precede application of the *per se* analysis–whether Ford is a horizontal competitor of the coachbuilders. Ford does not manufacture or sell limousines. It manufactures base vehicles that are later converted into limousines by coachbuilders. Aside from safety and liability concerns, we question whether there are any rational economic reasons for Ford to compete with any of the coachbuilders. Unlike the dissent, we also question whether Ford's position in the market as a supplier of base vehicles to coachbuilders changed with the formation of QVM and LIMO.

could tend to undercut consumer confidence in all limousines, and thereby decrease overall limousine sales. On the other hand, "When consumer confidence in a market is increased, consumers enter the market or are willing to purchase more." Areeda & Hovenkamp at ¶ 2230b. Because the economic impact of safety standards is not immediately discernable, something more than a cursory *per se* analysis is required to determine whether the restraint was unreasonable.

The Seventh Circuit recognized these principles in Moore v. Boating Indus. Ass'ns, 819 F.2d 693 (7th Cir. 1987). There, an association of boat trailer manufacturers was concerned that a boat trailer lamp manufacturer's products did not meet federal safety standards. Id. at 700-02. After the association received tests from an independent laboratory indicating that the lamps indeed failed to meet federal standards, the association decided it could no longer certify boat trailers that used the non-complying lamps. Id. at 702. The lamp manufacturer filed suit claiming that the association violated antitrust laws by engaging in a group boycott with the purpose of eliminating competition in trailer lights. Id. The Seventh Circuit held that plaintiff's claim should have been analyzed under the rule of reason. Id. at 710. First, the Court found that there was not a horizontal group boycott, as the boat trailer manufacturers and the boat trailer lamp manufacturers were not competitors. Id. at 700. Second, the Court found that *per se* analysis was inappropriate because the anticompetitive affects of the restraint were not immediately apparent. Id. at 710-11. The Court stated,

> To promote compliance with the [National Traffic and Motor Vehicle Safety Act] and the standards under it, admittedly the purpose of defendants in their compliance program, is not an activity which is "characteristically . . . likely to result in predominantly anticompetitive effects," [Northwest Wholesale Stationers, Inc., v. Pacific Stationery & Printing Co.,] 472 U.S. at 296. There is no justification, therefore, for applying a *per se* analysis to such activity. Id.

Admittedly, the case at bar presents a closer question than <u>Moore</u>. Many of the limousine manufacturers with whom Ford allegedly conspired were direct competitors of Craftsmen. In addition, there is no evidence that Craftsmen's products failed to meet federal safety standards at the time defendants allegedly pressured the trade publications to exclude non-QVM products. Nevertheless, the record reveals that the National Highway Traffic Safety Administration encouraged Ford to develop product safety testing, because it was concerned that many coachbuilders were either ignorant of or not abiding by the Federal Motor Vehicle Safety Standards. Ford responded to the call. It spent millions of dollars researching and developing base vehicles, and it determined how to convert those vehicles in compliance with federal safety standards. Through its QVM program, Ford made all coachbuilders aware of the federal safety standards and taught all coachbuilders how to comply with them. Ford disseminated the engineering designs, instruction manuals and test data it developed to QVM and non-QVM coachbuilders alike.[15]

Ford also may have had profit-making motives in mind when it created the QVM standards and allegedly pressured the trade publications not to advertise non-QVM vehicles. However, the fact remains that safety concerns were arguably a motivating factor behind Ford's actions. On this point, we find it significant that the trade magazines did not exclude *all* non-QVM products; *Limousine & Chauffeured Magazine* allowed non-QVM coachbuilders to advertise upon submission of independent crash-testing data, and *Limousine Digest* allowed non-QVM advertisements so long as the coachbuilder certified, through "some independent

[15] The dissent makes the case for why Ford's safety concerns were a pretext for anti-competitive behavior. However, it ignores countervailing evidence that the Federal Government encouraged Ford to develop testing to ensure that converted limousines complied with federal safety standards. The evidence presented at trial created a legitimate fact dispute that the jury should have analyzed under the rule of reason rather than the *per se* rule, which presumes that Ford's motives and the effect of its actions were anti-competitive.

means," that its vehicles met federal safety regulations. (Tr. 1185.) We acknowledge that the National Highway Traffic Safety Administration did not require Craftsmen to crash-test its vehicles to prove they were safe. However, the fact that at least one of the trade publications required Craftsmen to take measures beyond what the National Highway Traffic Safety Administration required does not convince us that the *per se* rule should be applied. Whether the crash-testing requirement was disproportionate to the harm it sought to remedy is a question that is appropriately analyzed under the rule of reason. See State Oil Co., 522 U.S. at 10 (when applying the rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect").

At this juncture, we cannot and need not determine whether defendants' alleged restraint actually had procompetitive effects. As the Supreme Court held in California Dental Ass'n v. FTC, 526 U.S. 756 (1999), when determining whether to apply the rule of reason analysis to non-price advertising restrictions related to product safety, the issue is not whether the restrictions *were* procompetitive, but whether they *could be*. Id. at 778 ("[T]he plausibility of competing claims about the effects of the professional advertising restrictions rules out the indulgently abbreviated review to which the Commission's order was treated."). See also Areeda & Hovenkamp at ¶ 1911b (stating that courts must consider the *plausibility* of procompetitive effects when determining which mode of analysis to apply). Because the alleged restraints were arguably based, at least in part, on safety concerns, they may have had some procompetitive effects. It follows that an abbreviated *per se* analysis was inappropriate. See California Dental, 526 U.S. at 770-781 (holding that a "quick look" analysis was inappropriate for restrictions imposed by professional association of dentists on member advertising where the likelihood of noncompetitive

-24-

effects of restrictions were not obvious, and restrictions could plausibly be thought to have procompetitive effect on competition).

C. Whether the Testimony of David Cole Satisfied the Requirements for the Admissibility of Expert Testimony.

The Court of Appeals reviews the district court's decision regarding the admissibility of expert witness testimony for an abuse of discretion. White v. Ford Motor Co., 312 F.3d 998, 1007 (9th Cir. 2002).

Federal Rule of Evidence 702 governs the admission of expert testimony. The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, or experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

A district court has great latitude in determining whether expert testimony meets the reliability requisites of Rule 702. In making that determination, the district court is free to evaluate one or all of the following factors: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-95 (1993) (stating that "many factors will bear on the inquiry" and that the above-listed factors do not

constitute "a definitive checklist or test"). See Blue Dane Simmental Corp. v. American Simmental Ass'n, 178 F.3d 1035, 1039-1040 (8th Cir. 1999) (applying Daubert analysis to expert witness testimony in an antitrust case).

We agree with the district court that Craftsmen's expert, David Cole, had sufficient education and experience to testify as an expert regarding plaintiffs' damages. However, Cole's testimony did not sufficiently aid the jury in determining whether there was an "unreasonable" restraint on trade in violation of the Sherman Act. Cole *assumed* that Craftsmen's alleged lost growth from 1995 through 1998 was caused by defendants' alleged conspiracy. He did not determine whether other factors, including the emergence of two direct competitors, may have affected Craftsmen's growth rate. Under the rule of reason analysis, which should have been applied in this case, such an analysis was required. Because Cole's expert opinion failed to "incorporate all aspects of the economic reality," Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir. 2000), it should not have been admitted.[16]

III.   CONCLUSION

For the foregoing reasons, the district court's damages award is vacated, and the case is remanded for a new trial on Craftsmen's Sherman Act claim.

---

[16] We are not foreclosing the possibility Cole can testify at a new trial. We agree he is qualified. He will have to formulate a new opinion using the proper standard under a rule of reason analysis.

LAY, Circuit Judge, dissenting.

It would be hard to imagine a more clearly expressed boycott and resulting restraint on trade than in this case, where these actions were, extraordinarily, documented by the Defendants.[17] It would also be hard to imagine a restraint with a more pernicious anticompetitive effect, as it effectively forced Craftsmen to join either the QVM or CMC programs or cease advertising its product. Reflecting on these undisputed facts, the district court applied the *per se* rule, evidently deciding that the advertising restraint "facially appears to be one that would always or almost always tend to restrict competition."[18] *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979). The majority now remands for application of the rule of reason on the basis that the restraint "could be" procompetitive and that safety concerns were "arguably" a motivating factor behind Ford's actions. I submit that the evidence does not support these "safety concerns" arguments, and respectfully dissent.

The *Per Se* Rule

The majority is correct to note that the rule of reason is the prevailing standard for analyzing a restraint's effect upon competition. However, the *per se* rule is not entirely obsolete. Both the Supreme Court and other circuit courts continue to

---

[17]The boycott agreement and resulting advertising restriction were documented in: 1) the April 30, 1996, LIMO minutes that set out the boycott agreement (J.A. 02091-92); 2) the May 6, 1996, letter from LIMO to the magazine that threatened the boycott (J.A. 02093-94); and 3) the May 9, 1996, fax from the president of LIMO to his fellow members congratulating them on the magazine's change of policy to ban advertisements of non-QVM/CMC coachbuilders (J.A. 02085).

[18]The district court decided the parties' motions for and against application of the *per se* rule from the bench at the close of the Plaintiff's evidence and did not give a rationale for why application of that rule was appropriate. (Tr. 1431-32.)

-27-

identify the *per se* rule as the accepted method of analysis for restraints that are obviously anticompetitive. *See State Oil Co. v. Kahn*, 522 U.S. 3, 10 (1997) ("Some types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*."); *see also InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 158-59 (3d Cir. 2003); *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 509 (4th Cir. 2002); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1058 (8th Cir. 2000).

The instant case appears to meet all of the characteristics of a typical *per se* case as described in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294 (1985):

> Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle. In these cases, the boycott often cut[s] off access to a supply, facility, or market necessary to enable the boycotted firm to compete, and frequently the boycotting firms possessed a dominant position in the relevant market. In addition, the practices were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive. Under such circumstances the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote.

*Id.* (citations and quotations omitted). In this case, Ford was irritated by the existence of small coachbuilders who were exploiting the profitable market for extra-long limousines. The existence of these small coachbuilders threatened Ford's QVM program because it essentially penalized QVM coachbuilders, who were prohibited from building extra-long limousines because of QVM restrictions. Consequently, Ford acted in concert with LIMO to quash this competition by using their combined

influence to cut off all national advertising resources to these small coachbuilders.[19] In light of this bold and undisguised anticompetitive behavior, I believe this case fits into that category of "agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality–they are 'illegal *per se.*'"[20] *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978).

Safety Concerns

I am not persuaded that Ford's supposed "safety concerns" remove this case from the purview of the *per se* rule. The evidence simply does not support that Ford was motivated by safety concerns. The majority stresses that Ford spent "millions of dollars" to develop the QVM program to establish safety standards for the manufacture of limousines. However, Ford's own internal documents demonstrate that the motivation behind the program was not safety, but to "ensure that Ford would

---

[19]I submit that there should be little doubt as to the existence of a horizontal agreement between the Defendants. Ford, a member of LIMO, had obviously involved itself in the manufacturing of limousines. Furthermore, the majority was correct to identify the existence of a conspiracy among the Defendants. I would only add that in addition to the evidence highlighted by the majority, the following evidence also supports that Ford influenced LIMO's agenda and spearheaded the boycott effort: 1) Ford encouraged the formation of LIMO around the time QVM began (Tr. 275); 2) Ford lobbied to keep non-QVM members out of LIMO (Tr. 289-90); 3) Ford voiced its opposition to allowing QVM members to advertise in trade journals that allowed non-QVM members to advertise (Tr. 347); 4) the magazines themselves seemed to be receiving similar pressure directly from Ford (Tr. 332-35); and 5) Ford pressured LIMO coachbuilders to make them keep non-QVM members out of LIMO because "[Ford] felt it was better coming from [LIMO] as an organization." (Tr. 282.)

[20]Neither Defendant advocated, or discussed, the application of the "quick look" standard, and it is not appropriate in any event because, in my view, the restraint is obviously anticompetitive.

retain its competitive advantage over Cadillac and further improve the image of [the] Lincoln Town Car" and "produce incremental sales and profits to Ford and its dealers." (J.A. 02213-16.)

The manner in which Ford implemented the program reinforces the idea that Ford was interested in market control and profits, not safety. Coachbuilder Marsha Tortora testified that from 1990 to 1997, Ford never once tested any of her limousines to confirm that she was following QVM guidelines or building safe limousines. (Tr. 274.) This would suggest that Ford was not as concerned with the safety of the end-product as it was with enrolling coachbuilders into the program to ensure that the builders were buying and converting its Lincoln Town Cars.

The idea that Ford was concerned with safety is further undermined by the fact that Ford took a very strong stand against allowing a non-QVM coachbuilder, Vinny Bergman, into LIMO, even though he could show compliance with federal safety standards through separate testing. Bergman, owner of Ultra Coach, wanted to join LIMO. (Tr. 290.) Although he stretched Lincoln Town Cars, he did not join the QVM program, presumably because he stretched the cars 180 inches, outside the QVM program parameters. (Tr. 289.) Bergman, however, proved his 180-inch stretches were compliant with federal safety standards, using an independent crash test study, which cost him $250,000. (Tr. 291.) Despite the fact that Bergman had proven compliance with federal safety standards, Ford pressured LIMO members to keep him out of the trade group. (Tr. 290.)

Despite this evidence, the majority insists that Ford's "safety concerns" take this case outside the scope of the *per se* rule. The majority relies principally on two cases to support its position. First, it cites *Moore v. Boating Industry Ass'ns*, 819 F.2d 693 (7th Cir. 1987), for the principle that the promotion of federal safety standards is not something that is likely to be anticompetitive, and therefore application of *per se* analysis is inappropriate. *Id.* at 710-11. The critical distinction

between this case and *Moore*, however, is the absence of evidence that Craftsmen's limousines were unsafe or failed to meet federal safety standards. There was also no suggestion in *Moore* that "safety concerns" were merely a subterfuge for the desire for greater market control and profits, as is true in the instant case. Indeed, none of the conspirators in the *Moore* boycott were direct competitors of the plaintiff-manufacturer, whereas here, both of the Defendants stood to gain from Craftsmen's demise.

Second, the majority cites *California Dental Ass'n v. FTC*, 526 U.S. 756 (1999), stating that "the issue is not whether the restrictions *were* procompetitive, but whether they *could be*." I respectfully submit, however, that *California Dental* cannot be read to support such a sweeping proposition. The relevant language of the case actually reads, "the plausibility of competing claims about the effects of the professional advertising restrictions rules out the indulgently abbreviated review to which the Commission's order was treated. The obvious anticompetitive effect that triggers abbreviated analysis has not been shown." *Id*. at 778. It is not sufficient under *California Dental* to recognize, as the majority does, only that "safety concerns were arguably a motivating factor behind Ford's actions." Instead, a court must determine whether it is "plausible" that the procompetitive effects of the restraint outweigh, or at least equal, the anticompetitive effects. I respectfully submit this understanding of the case is compelled by the fact that the Court speaks of the restraint at issue in that case as plausibly having a "*net* procompetitive effect," *id.* at 771 (emphasis added), and not a "*net* anticompetitive effect," *id.* at 774 (emphasis added), suggesting that a court is required to weigh the competing effects when deciding which method of analysis to apply.

In other words, application of the rule of reason is not warranted simply because the restraint "could be" procompetitive, based on the Defendants' "arguable" motivations. If this were the case, the *per se* rule would hereafter be extinct, as inventive lawyers could always create a procompetitive justification for their clients'

monopolistic behavior. Instead, the procompetitive effects of a restraint must plausibly outweigh, or at least equal, the anticompetitive effects in order to move the case to rule of reason review.

Here, the procompetitive safety rationale is not plausible at all, and I submit the majority's fixation on these doubtful "safety concerns" is particularly inappropriate in light of the anticompetitive effect of the restriction on competition. Again, there is no evidence that Craftsmen's limousines were unsafe or failed to meet federal safety standards. Furthermore, as discussed above, the evidence suggests that Ford was not motivated by safety, but was interested only in extinguishing small companies that were taking advantage of the market for extra-long limousines, a market outside the control of Ford's QVM program. The majority finds significance in the fact that the restriction allowed advertisements of non-QVM coachbuilders who proved compliance with federal safety standards through separate testing, but this fact has little significance. I do not see how placing this burdensome testing requirement on small coachbuilders who already appear to be in compliance with federal safety standards, but who cannot afford to conduct expensive testing, is procompetitive. Finally, in contrast to these suspect safety claims, the anticompetitive effects of the restriction are overwhelming and undeniable, as it basically eliminated Craftsmen's ability to nationally advertise and promote its limousines. Accordingly, I would affirm the district court.

From my examination of the record, I fail to understand how any jury, under any method of analysis, could find for the Defendants in this case. The very purpose of the *per se* rule is to streamline antitrust analysis by making conclusive presumptions about restrictions that are obviously unreasonable. I respectfully submit that by remanding this case to be retried on the basis of this dubious safety rationale, the majority wastes time and judicial resources.

The anticompetitive effects of this restriction are so clear and pernicious, and the procompetitive effects of the restriction are so questionable and attenuated, that I submit the *per se* rule is the appropriate method of analysis in this case. I also suggest that the majority's proposed application of the rule of reason to any restraint that arguably "could be" procompetitive is a misinterpretation of *California Dental*, and an expansion of the rule of reason analysis.

_____